## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA (Tampa)

**Case No. 8:14-cv-02427-JDW-TGW**

**SECURITIES AND EXCHANGE
COMMISSION,**

      **Plaintiff,**

**v.**

**WEALTH STRATEGY PARTNERS, LC,
HARVEY ALTHOLTZ,
STEVENS RESOURCE GROUP, LLC, and
GEORGE Q. STEVENS,**

      **Defendants.**

_____

## MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6) F.R.C.P. ON BEHALF OF DEFENDANTS WEALTH STRATEGY PARTNERS, LC AND HARVEY ALTHOLTZ (DISPOSITIVE MOTION)

_____

Wealth Strategy Partners, LC ("WSP") and Harvey Altholtz (collectively, the "Defendants"), through their undersigned counsel, move to dismiss the Amended Complaint (the "AC"), pursuant to F.R.C.P. 12(b)(6), for the reasons stated below.

## I.    INTRODUCTION

Defendants ask the Court to determine that this second attempt to state a claim in this civil enforcement action brought by the Securities and Exchange Commission (the "SEC") fails to clear the low bar of plausibility.  The SEC filed the AC in response to Defendants' Rule 12(b)(6) Motion to Dismiss the initial complaint.  Despite extensive pre-filing fact gathering through its extensive investigative powers, and a 46-day enlargement of time to respond to Defendants' Motion to Dismiss, the SEC has yet to state a claim that is plausible. Defendants now ask that the AC be dismissed, with prejudice.

II.    **THE PARTIES' CONTENTIONS**

The SEC contends that WSP and Mr. Altholtz violated the anti-fraud provisions of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), the Securities Exchange Act of 1934 (the "Exchange Act"), Section 10(b) [15 U.S.C. § 78j(b)] and SEC Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a) [17 C.F.R. § 275.206(4)-8]. The SEC alleges also that Mr. Altholtz aided and abetted one aspect of the alleged fraud committed by WSP under the Advisers Act.

Most of the violations alleged occurred more than five years before this case was filed. AC ¶¶ 39, 44, 46-48, 66, 69-70.  The most recent violations alleged are now almost five years old.  AC ¶¶ 26-30.

WSP is the general partner of two investment partnerships:[1]  the Adamas Fund, LLLP, f/k/a the Black Diamond Fund LLLP ("Adamas"), and the Stealth Fund LLLP ("Stealth") (referred to collectively as "the Funds").  AC ¶ 18.  Mr. Altholtz is a principal, and acted for, WSP.  AC ¶ 17.

Adamas and Stealth are small, private investment partnerships which are exempt from most regulation under the Investment Company Act of 1940.  AC ¶ 29; 15 U.S.C. § 80a-3(c)(1); Private Placement Memorandum, the Black Diamond Fund (the "Adamas PPM") appended as Exhibit 1, pp. 10-11; Private Placement Memorandum, the Stealth Fund, LLP (the "Stealth PPM"), appended as Exhibit 2, p. 6.  The Funds invested in small companies, referred to as "nanocaps."  (the "Portfolio Companies").  AC ¶ 26.

---

[1]    Factual allegations are assumed to be true for purposes of this motion.

Both Adamas and Stealth, until January, 2010, used independent investment advisers with discretionary authority to determine the acquisition and disposition of securities in the Funds' portfolios.  The Nutmeg Group, LLC was the Funds' investment adviser from inception until approximately October, 2008[2], and was succeeded by the Stevens defendants from October, 2008, until January, 2010.  AC ¶¶ 19, 20, and 31.  WSP was responsible only for providing administrative and managerial services.  AC ¶28.

The SEC's allegations of securities fraud arise from three sets of circumstances.

An Altholtz family trust loaned $300,000 to Stealth in December, 2008.  AC ¶ 69. WSP loaned $250,000 to Adamas in January, 2009.  AC ¶ 66.  Altholtz family trusts also loaned $825,000 to two Portfolio Companies, which Stealth guaranteed in part.  AC ¶¶ 46-49. Stripped to its essentials, the SEC contends that the Defendants violated the anti-fraud provisions by using *their* assets to benefit the Funds by making these loans.

Periodic newsletters sent to the Funds' limited partners, prepared and signed by Mr. Stevens, regarding the status of the various Portfolio Companies are alleged to be misleading with respect to four portfolio companies.  Mr. Altholtz merely reviewed and approved those allegedly misleading reports.  His name appears as a co-author only on reports for September, 2009.  AC ¶¶ 73-76; 86.

An Altholtz family trust which was a limited partner in Stealth was allowed to withdraw as a limited partner, and receive the balance of its capital account, in early 2010, which the SEC characterizes as a preferential redemption.  AC ¶¶ 95-99.

---

[2] Defendants request that the Court take judicial notice of a separate enforcement action that the SEC is pursuing against the Nutmeg Group and its principals.  *SEC v. The Nutmeg Group, et al.*, Case No. 09-CV-1775 (U.S.D.C. N.D. Ill.).  The SEC has alleged a variety of wrongdoing and that Stealth is Nutmeg's largest victim.  A copy of the Nutmeg complaint is appended as Exhibit 3.

Defendants' position is: 1) a general partner which uses more than $1 million of its assets to benefit the limited partnership does not defraud either the partnership or its partners; 2) the newsletters were not materially misleading, and were not Defendants' statements made negligently or with an intent to defraud; 3) the alleged preferential distribution was not even a breach of fiduciary duty, let alone a fraud.

## III.   THE AC MUST ALLEGE FACTS (AS OPPOSED TO CONCLUSIONS) THAT STATE A PLAUSIBLE CLAIM FOR RELIEF.

The standard under which the sufficiency of a claim is evaluated is not particularly rigorous.  A complaint must allege sufficient facts to state a claim which is plausible on its face.  *McGee v. S-A Development, LLC*, 2012 WL 760797, at *1 (M.D. Fla. Mar. 8, 2012). Plausibility does not mean probability, but is more than a mere possibility that the defendant has acted unlawfully.  *Id*.  Legal conclusions, unsupported by facts, do not support plausibility.  *McGee* at * 9.  Where, as here, fraud is alleged, F.R.C.P. 9(b) requires that the circumstances constituting fraud must be stated with particularity.  *SEC v. Spinosa,* 2014 WL 2938487, at *1-2 (S.D. Fla. June 30, 2014).

A claim is properly dismissed where the facts alleged in the complaint demonstrate the defense of statute of limitations.  *SEC v. Wall Street Communications, Inc.,* 2009 WL 2579310, at *3 (M.D. Fla. 2009).

The sufficiency of a complaint generally is determined from its four corners. However, where, as here, a complaint makes specific reference to documents which are not attached to it, a defendant may submit those documents for the court's consideration. *Trinidad and Tobago Unit Trust Corp. v. CB Richard Ellis, Inc.,* 280 F.R.D. 676, 677-8 (S.D. Fla. 2012).

## IV.   THE SEC'S FRAUD ALLEGATIONS ARE IMPLAUSIBLE

### A.   The Contentions That a General Partner Has Committed Fraud by Using Its Own Resources to Benefit the Partnership is Implausible.

The contention that Defendants, either directly, or indirectly through Altholtz family trusts, committed fraud by providing cash to the Funds and two Portfolio Companies are at the heart of Counts I, IV, VII, XII and XIII.  That contention defies common sense.

The Eleventh Circuit Court of Appeals observed that "Rule 10b-5 is about fraud, after all, and it is not fraudulent to conduct business in a way that makes investors better off." *Finnerty v. Stiefel Laboratories, Inc.*, 756 F.3d 1310, 1320 (11th Cir. 2014).  The truth behind the court's observation has eluded the SEC.

WSP loaned Adamas $250,000 in January 2009.  That loan was assigned to an Altholtz family trust and repaid in April 2010, with interest.  AC ¶¶ 45 and 46.  An Altholtz family trust loaned Stealth $300,000 in December, 2008.  Only the principal was repaid in April 2010.  Complaint, ¶¶ 47-48.

The SEC does not allege any facts suggesting that these loans were detrimental to the Funds or their partners.  Neither loan is alleged to have been unnecessary.  Although the SEC characterized the interest rate on one loan as "exorbitant," AC ¶ 67, it alleged no facts that suggest that the interest rate was unreasonable in light of the risk taken by the lender.  Nor does the SEC allege that another lender was willing to make a similar loan on terms more favorable to the Fund.  The SEC does not allege that the Funds, and their partners, failed to benefit from the loans.  The SEC concludes the loans were made to "artificially" keep the Funds afloat and mislead investors about the Funds' financial strength.  The SEC alleges no facts to support its assertion that anything about the loans was "artificial."  AC ¶ 7.  Further,

the SEC alleges no facts showing that the Funds would have failed without the loans, and identifies no statement regarding the Funds' financial health that was materially misleading.

The allegation that WSP and Mr. Altholtz defrauded Stealth's partners by having Stealth provide a partial guaranty of loans to two Portfolio Companies is similarly implausible.  Under the SEC's theory, the Defendants put a large amount of their resources at risk in transactions which stood to benefit Stealth (which was a substantial equity holder in the borrowers) and its partners far more than the Defendants.

All that appears from the factual allegations relating to the loans to the Funds and the Portfolio Companies is that WSP and Mr. Altholtz risked their money to benefit the partners of both Adamas and Stealth.  As the Eleventh Circuit noted in *Finnerty v. Stiefel Laboratories, Inc.*, that is not fraud under the securities laws.

> **B.** **The SEC Has Not Alleged a Plausible Claim That Defendants Made Fraudulent Misrepresentations Regarding Loans and Guaranties.**

Claims Under the Securities Act.  Section 17(a)(2) of the Securities Act provides in relevant part:  "It shall be unlawful for any person in the offer or sale of any securities . . . (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  The SEC fails to state a plausible claim that WSP or Mr. Altholtz violated that provision in connection with loans and guaranties.

The misrepresentations alleged here are omissions; Defendants failed to disclose that money had been loaned to Adamas and Stealth and that Stealth guaranteed, in part, loans made to two Portfolio Companies.  AC ¶¶ 44, 67, 72.[3]

The failure to disclose a fact is actionable under Section 17(a)(2) when the omitted fact is both material, and necessary to make the statements actually made not misleading. *See*, *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309, 1321 (2011) (construing Rule 10b-5(b)).  An omitted fact is material when there is a substantial likelihood that the fact would significantly change the total mix of information available to an investor.  *SEC v. Goble*, 682 F.3d at 944.  An omitted material fact is necessary to make a statement made not misleading when the omission makes a statement made so incomplete as to alter its meaning. *McDonald v. Kinder-Morgan, Inc.* 287 F.3d 992, 998-9 (10th Cir. 2002).

Defendants made no actionable misrepresentations with respect to guaranties or loans.[4]

Although the SEC speculates why guaranties might be of interest to investors, AC ¶¶ 50-54, it fails to identify any statement made to investors, or potential investors, that was rendered misleading by not disclosing that the partial guaranties had been made.

As the Supreme Court made clear in *Matrixx Initiatives, Inc. v. Siracusano*, *id.*, securities fraud does not result merely from the failure to disclose a fact that might be of

---

[3] The alleged omissions regarding the guaranties were of short duration;  the SEC admits that the guaranties of the ICCW loan were disclosed by email to investors in July, 2009.  AC ¶ 61. The email referred to in ¶ 61 is appended as Exhibit 4, and belies the SEC's characterization that guaranties were merely being considered, or that Defendants were seeking permission.

[4] The loans guaranteed by Stealth were not "personal" loans by WSP or Mr. Altholtz, as the SEC alleged, AC ¶ 57.  The loans were business loans providing needed cash to companies in which Stealth held significant equity positions.

interest to an investor.  The omitted fact must change the meaning of something actually represented.  General references to Stealth's "future health," ¶ 50 or "true financial strength," AC ¶ 52, are insufficient to state a plausible claim for a misrepresentation by omission without an identification of a statement actually made regarding Stealth's financial strength or health that was misleading.

The SEC tries to create the appearance of a misrepresentation by arguing that the guarantees were prohibited by Stealth's Operating Agreement, AC ¶ 55, and suggesting that the Operating Agreement became misleading once guaranties were made. By its language, the Operating Agreement prohibited loans from the General Partner, not guaranties.  *See*, Stealth Operating Agreement, appended as Exhibit 5, Section 2.  Nothing in Stealth's Operating Agreement prohibited Stealth from guaranteeing loans to portfolio companies by third parties, including third parties affiliated with the general partner.

Nor were Stealth's offering documents misleading because the word "guaranty" was not mentioned.  Stealth's Operating Agreement provided WSP with extremely broad authority to enter into agreements which WSP determined would advance Stealth's business.  Article 3.1 of Stealth's Operating Agreement allows it to ". . . enter into and perform all contracts and other undertakings that [the General Partner] may deem necessary or advisable or incidental thereto . . . ."  The Operating Agreement authorized Stealth to enter into "all contracts, agreements and other undertakings," Article 3.1(e), and to "execute all other instruments of any kind or character which the General Partner determines to be necessary or appropriate in connection with the business of the Fund."  Article 3.1(h).

That language is broad enough to encompass a guaranty of a loan to a portfolio company, which clearly advances Stealth's economic interest.  *See, SEC v. St. Anselm Exploration Co.,* 936 F.Supp.2d 1281,1295 (D.Colo. 2013) (broad language regarding the use of funds was not misleading by failing to identify a specific use); *SEC v. Siebel Systems, Inc.,* 384 F.Supp.2d 694, 704 (S.D.N.Y. 2005) ("nit-picking should not become the name of the game").  The failure to identify guaranties did not change the meaning of what was disclosed; therefore, what was disclosed was not misleading.  Nor did the omission create a substantial likelihood that a reasonable investor would view the omission as significantly altering the total mix of information available; therefore, the omission is not material.  *SEC v. Goble*, 682 F.3d at 943, n.5.

With respect to loans made to the Funds by WSP or alleged affiliates, the SEC argues that once loans were made the Operating Agreements, which prohibited those loans, became misleading. However, the AC fails to allege any facts plausibly suggesting that a loan by WSP or affiliates to the Funds was a material fact.

The AC alleges no facts regarding the purpose behind the restriction on WSP's ability to loan money to the Funds.  Both Stealth and Adamas were free to borrow money from anyone other than WSP and its affiliates.  Exhibit 5, Section 3.1(c).[5]  The AC does not allege facts that show that a reasonable investor would consider it important to its investment decision in a Fund that WSP or one of its affiliates, as opposed to an unaffiliated lender, was the source of a loan that benefitted the Funds.  Although materiality is often a question of fact,

---

[5]  Adamas' operating agreement is essentially identical to Stealth's regarding the ability to borrow money.

nothing in the Complaint raises a plausible issue that the source of funds for a necessary loan was important to investors.

 <u>Defendants Did Not Receive Money or Property By Means of an Untrue Statement</u>. Apart from the failure to allege a misrepresentation, the SEC failed to allege facts showing that WSP or Mr. Altholtz obtained money or property by means of a misrepresentation regarding Stealth's partial guaranty of loans to its portfolio companies – an element of a violation of Section 17(a)(2).

 The Defendants' failure to disclose Stealth's guaranties occurred in April 2009, when Stealth made its first guaranty.  AC ¶¶ 44 and 46.  Because Section 17(a)(2) requires that Defendants obtain money or property by means of a misrepresentation, the only transactions where a violation of Section 17(a)(2) resulting from undisclosed guaranties is even possible are those sales of limited partner interests that occurred between April 2009 and July 2009, when the SEC concedes that WSP informed Stealth partners that Stealth would partially guaranty loans which it arranged.  AC ¶ 61.  Purchases of interests in Stealth prior to April of 2009 or after July 2009 could not have resulted in any money or property being obtained by means of a failure to disclose guaranties.

 For interests in Stealth sold between April and July, 2009, it is not enough that Stealth may have obtained money or property by means of an untrue statement relating to loans to the Funds or guaranties which Stealth provided.  The defendant who is alleged to have made the misrepresentation must be the one to obtain money or property by means of that misrepresentation.  *SEC v. Spinosa*, 2014 WL 2938487, at *6; *SEC v. Syron*, 934 F.Supp.2d 609, 637-640 (S.D.N.Y. 2013).  *SEC v. Daifotis*, 2011 WL 2183314, at *10 (N.D. Cal. June 6,

2011).  *But see*, *SEC v. Stoker*, 865 F. Supp. 2d 457, 462-3 (S.D.N.Y. 2012).  There are no factual allegations that WSP or Mr. Altholtz, directly or indirectly, received any money derived from any investment caused by a misrepresentation.

Similarly with respect to loans made to the Funds, the earliest loan to Stealth was made in December, 2008.  AC ¶ 69.  Therefore, any money received prior to that was not obtained by a misrepresentation regarding loans. The AC does not allege facts showing that either WSP or Mr. Altholtz, directly or indirectly, received money or property by means of the alleged misrepresentations relating to loans to Stealth after December, 2008.  No proceeds of sales are alleged to have been paid to either of them.  The SEC alleged that WSP was "entitled" to a management fee based on the Funds' month end net assets, and that Mr. Altholtz received some or all of the fees paid to WSP.  AC ¶ 28.  However, there are no allegations that management fees actually paid to WSP or actually received by Mr. Altholtz included money derived from investments in Stealth made during the three-month period from April to July, 2009.

The earliest loan to Adamas was in January, 2009.  AC¶ 66.  That is almost a year *after* the last sale of limited partnership interests.  AC ¶ 29.  Since no money or property was obtained by means of a misrepresentation with respect to Adamas, the claim under Section 17(a)(2) with respect to loans made to Adamas fails in its entirely.

Because no facts are alleged stating a plausible claim that Defendants received money or property by means of the failure to disclose a material fact, the Section 17(a)(2) claim relating to loans and guaranties must fail.

<u>Violations of Rule 10b-5</u>  Rule 10b-5 is violated only when a material misrepresentation is made by the defendant, with an intention to defraud (*scienter*), in connection with the purchase or sale of a security.

The arguments regarding the failure to allege any misrepresentation (regarding the guaranties) or a material misrepresentation (regarding the guaranties and loans) for purposes of the alleged violation of Section 17(a)(2) apply to the alleged violations of Rule 10b-5.

The AC also fails to state a plausible claim that WSP and Mr. Altholtz violated Rule 10b-5 by failing to disclose the existence of the guaranties or loans because the AC fails to allege any facts that indicate that either WSP or Mr. Altholtz acted with *scienter*.

No facts are alleged that raise an inference that the Defendants were trying to trick anyone into investing in the Funds by failing to disclose that they reached into their own pockets to provide cash that benefitted the Funds.  Further, no facts are alleged that the Defendants knew that an investor would consider the existence of the loans or guaranties to be material, and would be misled by a failure to disclose the loans or guaranties.  *SEC v. Gane*, 2005 WL 90154, at *15 (S.D. Fla. Jan. 4, 2005).  Therefore, *scienter* has not been plausibly alleged.

The alleged violations of Section 17(a)(1) and Rule 10b-5 relating to loans and guaranties fail to state a claim.

<u>Violations of Section 206 of the Advisers Act, and Rule 206(4) and Rule 206(4)-8.</u>  WSP and Mr. Altholtz did not violate Rule 206(4)-8 by any misrepresentations regarding loans and guaranties because they were not investment advisers when the alleged misrepresentations were made.  Rule 206(4)-8 prohibits an investment adviser from

employing schemes to defraud, or making misrepresentations to, the members of a pooled investment vehicle.  The SEC alleges that WSP and Mr. Altholtz became investment advisers to the Funds in January, 2010.  AC ¶¶ 17 and 18.

The AC alleges that the Stealth offering materials were distributed until at least November, 2009.  AC ¶ 56.  There is no allegation that any of Adamas or Stealth's offering materials were distributed during or after January, 2010.  The failure to allege facts that either WSP or Mr. Altholtz made any misrepresentation regarding guaranties or loans at the time that either were investment advisors results in a failure to state a plausible claim that either WSP or Mr. Altholtz violated Rule 206(4)-8(a)(1).

The AC also fails to state a plausible claim that Mr. Altholtz aided and abetted the alleged violation of Rule 206(4)-8(a)(1) by WSP, as alleged in Count XIII.  To state a claim for aiding and abetting, the SEC must allege a primary violation by a third party to which the alleged aider and abettor knowingly provided substantial assistance.  *See*, *SEC v. Goble*, 682 F.3d at 947 (interpreting aiding and abetting under Section 20(e) of the Exchange Act).  Because the AC fails to state a plausible claim that WSP violated Rule 206(4)-8(a)(1), no claim has been stated against Mr. Altholtz as an aider and abettor.

### C. The SEC Has Not Alleged a Plausible Claim that Defendants' Alleged Actions Relating to Newsletters Violated the Anti-Fraud Provisions.

Partners in Stealth and Adamas were provided with newsletters which updated them on the status of the Funds and their Portfolio Companies.  AC ¶ 38.  Mr. Stevens, the Funds' independent investment adviser, wrote the newsletters after researching publicly available information and speaking directly with representatives of the Portfolio Companies.  AC ¶¶ 39,

74. Mr. Altholtz reviewed and approved Mr. Steven's work before it was distributed. AC ¶ 39.

Newsletters for December 2008 and March 2009, which were distributed in February 2009 and April 2009 respectively, were attributed only to Mr. Stevens. AC ¶ 39. A newsletter which was dated September 2009 and distributed in October 2009 was attributed to both Mr. Stevens and Mr. Altholtz. AC ¶ 40. The SEC contends that the newsletters contained misrepresentations regarding Portfolio Companies Apple Rush Company, Physician's Health Care Management Group, Inc., Access Key and ICCW. AC ¶¶ 77-93.

<u>Newsletters Were Not Distributed in Connection With an Offer, Purchase, or Sale of a Security</u>. The SEC has made no factual allegations that newsletters to Adamas partners were "in connection with" the offer or sale, or the purchase or sale, of a security, which are essential elements of the claims under Section 17(a)(2) and Rule 10b-5, respectively. AC ¶¶ 30, 38 and 66. Adamas began offering interests in April, 2007, AC ¶ 28, and lasted until $10 million was raised, unless extended by the general partner. Exhibit 1. By February, 2008, $18.1 million had been raised. AC ¶ 29. The SEC has not alleged any facts showing that the Adamas offering was extended beyond February, 2008. *See*, Private Placement Memorandum, appended as Exhibit 1, p. 6.

The first allegedly misleading newsletter for Adamas was distributed in February 2009, a year after the conclusion of the Adamas offering. AC ¶¶ 29 and 39. Therefore, no statements in the Adamas newsletters were made in connection with the offer of any interests in Adamas, and no money or property was obtained by Adamas by means of any misrepresentations in a newsletter.

The SEC's allegation that some investors made additional investments after receiving misleading newsletters, AC ¶ 94, only makes it possible, not plausible, that a misrepresentation in a newsletter was in connection with a sale, which is an essential element of a violation of Rule 10b-5. Without further factual allegations regarding the temporal relationship between the receipt of a particular newsletter and the sale of an interest in the Funds, any inference that an alleged misrepresentation was in connection with a sale is speculative, and a claim for violation of Rule 10b-5 has not been stated.

Newsletters Did Not Contain Material Misrepresentations. The SEC's contention that the newsletters contain misrepresentations which are material to the limited partnership interests of Adamas and Stealth is belied by a review of the newsletters.

Most of the alleged misrepresentations are in the March, 2009 newsletters to Adamas and Stealth partners, which the SEC alleges were disseminated in April, 2009. Those newsletters are attached as Exhibits 6 and 7. The March 2009 Adamas newsletter includes write-ups of twenty Portfolio Companies, only two of which are alleged by the SEC to be misleading. AC ¶¶ 54 and 63. The Stealth newsletter addresses nine portfolio companies, of which only two write-ups are alleged to be misleading.[6] The overall tone of both newsletters is negative. It appears that the only write-ups alleged to be misleading are those with even a hint of positive news.

The newsletters primarily express Mr. Stevens' opinions and projections. The newsletters did not discuss how the prospects of the two companies whose write-ups were

---

[6] The write-up of Physicians Healthcare Mgt. Group, Inc. in the March, 2009 Stealth newsletter makes no mention of its cash position, as alleged. AC ¶ 78.

alleged to be misleading might affect Adamas, except to caution that shares of ICC WorldWide ("ICCW") had to be sold slowly because of volume restrictions.  Exhibit 6.

Mr. Stevens' write-up of ICCW in the Adamas newsletter began by stating the company "has been a very difficult situation for the fund."  There is no mention in the newsletter of revenue, or revenue growth for ICCW, although the SEC recognized that ICCW's revenue grew 36% from the quarter ending December 31, 2008 to the quarter ending March 30, 2009.  AC ¶ 90.  Mr. Stevens expressed his opinion that ICCW "is on track to be cash positive by June," and discusses growth in some geographic areas in Europe and in business relationships.  The SEC does not allege that any of those statements are false; rather, it asserts that this write-up "misled investors into believing that the company was growing rapidly and generating substantial revenues."  The SEC's assertion is not supported by what Mr. Stevens actually wrote.  Further, ICCW's actual revenue growth, as recognized by the SEC, provides strong support for an opinion of strong revenue growth had Mr. Stevens expressed such an opinion.

The SEC contends that Mr. Stevens' statement that Physician's Healthcare Management had "a substantial amount of cash" was misleading only because it did not disclose the source of the cash.  AC ¶ 78.  However, even if Mr. Stevens' write-up was incomplete by not discussing the source of Physicians Healthcare's cash, the failure to disclose the source of cash did not render misleading true statement that the company had a substantial cash position.  *SEC v. St. Anselm Exploration*, 936 F.Supp.2d at 1295.

The Stealth newsletter provides no further support to the plausibility of the SEC's claim that the newsletters contained factual misrepresentations that were material to the

Funds' securities. That newsletter makes assertions similar to those in the Adamas newsletter, but contains nothing that is material to the value or potential value of interests in Stealth.

     <u>Defendants Were Not Negligent With Respect to the Newsletters</u>. Apart from whether the newsletters were misleading, there are no factual allegations to support the conclusion that WSP and Mr. Altholtz were negligent in their review, or dissemination of the newsletters. Mr. Stevens, according to the SEC, researched the companies from publicly available sources, and communicated with company insiders. AC ¶ 74. There are no allegations that Mr. Stevens learned, or should have learned, facts from his research that should have changed the opinions which he expressed. The SEC does not allege any facts indicating that WSP or Mr. Altholtz could not rely on Mr. Stevens' opinions. After all, Mr. Stevens was the investment adviser responsible for determining the securities that the Funds would own. The SEC does not claim that Mr. Altholtz was aware of facts inconsistent with Mr. Stevens' opinions or projections, or that Mr. Altholtz had a duty to do independent research which, if done, would have shown that Mr. Stevens' opinions and projections lacked factual support.

     That Mr. Altholtz is alleged to have been the Chairman of ICCW, AC ¶ 92, and knew or should have known of its financial status adds nothing to the SEC's claim, since the SEC does not allege that any of the statements actually made about ICCW addressed its financial status, or were inaccurate. Because facts are not alleged showing that the newsletters contained misrepresentations material to the Funds' securities, or showing that the Defendants were negligent in their review of Mr. Stevens' work, a violation of Section 17(a)(2) has not been stated.

<u>Defendants Did Not Violate Rule 10b-5 With Respect to the Newsletters</u>.  The SEC's failure to allege material misrepresentations contained in the newsletters, as discussed above, also show that no claim for relief has been stated under Rule 10b-5.

In addition, because violations of Rule 10b-5 require proof of *scienter*, the AC must allege sufficient facts to raise a plausible inference that the Defendants acted with a fraudulent state of mind with respect to the newsletters to state a claim under Rule 10b-5.  Just as there are no facts alleged that show WSP or Mr. Altholtz were negligent with respect to the newsletters, there are no facts alleged in the AC that support a plausible inference that Mr. Altholtz knew, or was reckless in not knowing, that the newsletters were inaccurate or misleading in any way, if, in fact, they were.

<u>Defendants Did Not Make the Statements in the Newsletters</u>.  Except for the September, 2009 newsletters, neither Mr. Altholtz nor WSP were alleged to be the "makers" of any statement in any of the newsletters within the meaning of Rule 10b-5.  In *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011), the Supreme Court made clear that only a "maker" of a statement is liable under Rule 10b-5 for a statement that is false and misleading.  The "maker" of a statement is the person with the ultimate authority over the contents of the statement and whether and how to distribute it.  *Id.*  The court noted further that the person to whom a statement was attributed was strong evidence that person was the maker of a statement.

With respect to the newsletters, other than the September, 2009 newsletter, Mr. Stevens wrote the newsletters, and the newsletters were attributed to him.  There are no factual allegations that WSP or Mr. Altholtz otherwise had the ultimate authority over the

contents of the newsletters.  For purposes of Rule 10b-5, under *Janus Capital*, WSP and Mr. Altholtz were not the "makers" of any statement in any of the newsletters, except for the September, 2009 newsletter.

With respect to the September, 2009 newsletter, the only allegedly false statement was the representation that Access Key "continues to do quite well even during these depressed economic times."  AC ¶ 61.  However, asserting that a company is doing "quite well" is the kind of generalized statement of corporate optimism which is not actionable under Rule 10b-5. *McGee v. S-Bay Development, supra,* at *3.

### D.    No Plausible Claim Has Been Stated Regarding Alleged Preferential Redemptions.

Counts III, VI, and IX allege that WSP and Mr. Altholtz violated the anti-fraud provisions of both the Securities Act and the Exchange Act in early 2010 by giving preferential treatment to an Altholtz family trust which was an Adamas partner.  That partner was allowed to withdraw from the partnership and received what remained in its capital account.  AC ¶¶ 67-70.

The facts alleged in the AC do not state a plausible claim for violation of the securities laws.

There are no allegations that any representation regarding redemptions were false, or in connection with the offer or sale of a security.

The Adamas Operating Agreement made clear that a limited partner has no right to withdraw, but may be permitted to do so in the sole discretion of the General Partner.  Adamas Operating Agreement, appended as Exhibit 8, Section 9.1.  Nothing requires the General Partner to treat all requests for withdrawal equally, regardless of the timing of a

request to withdraw, the size of the capital account that would have to be returned, or the particular circumstance of the limited partner making the request.

The SEC's theory that WSP and Mr. Altholtz acted improperly by allowing an affiliated limited partner to withdraw while there was an unaffiliated limited partner who was not allowed to withdraw rests on an unstated premise that WSP and Mr. Altholtz had a duty to subordinate a withdrawal request from an affiliated limited partner to withdrawal requests from every other limited partner.  However, no such duty exists.

Even if there was some unfairness in allowing an affiliated limited partner to withdraw while not allowing an unrelated limited partner to do so, (which the AC does not plausibly allege) [7] the law has been clear since *Santa Fe Industries v. Green*, 430 U.S. 462, 475-6 (1977) that unfairness does not violate the anti-fraud provisions in the absence of deception. *Accord*, *Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042, 1048-9 (11th Cir. 1987). At most, the SEC has alleged that WSP and Mr. Altholtz exercised unfairly the broad discretionary authority which WSP has to allow withdrawals.

The SEC has not alleged any deception. The representations allegedly made to other partners regarding "redemptions" during early 2010 are not alleged to have been false.  AC ¶¶ 96-98.  Further, none of the representations alleged were "in connection with" or material to, either an offer or sale of a security, or the purchase or sale of a security.  *SEC v. Goble*,

---

[7]      Even the improper exercise of discretion has not been plausibly alleged.  There are no allegations that other partners requesting redemptions had given required notice, and no allegations that the size of other "redemption" requests could have been satisfied from assets that could have been liquidated for reasonable value.  No facts have been alleged that any other Adamas limited partner was similarly situated to the Altholtz family trusts, which, at the time of its withdrawal, had extended approximately $825,000 in loans to an Adamas Portfolio Company and a $250,000 loan directly to Adamas which had not been repaid at the time that the family trust was allowed to withdraw.  AC ¶¶ 46-49.

682 F.3d at 944-946.  Without allegations of fact that show a plausible claim that the so-called preferential redemption involved a deception that was in connection with, and material to the offer, purchase, or sale of a security, the SEC's fraud claims against WSP and Mr. Altholtz fail.

      **E.**     **No Plausible Claim for Scheme Liability Has Been Alleged.**

      The prohibitions against schemes to defraud, or scheme liability, are found in Section 17(a)(1) and (3) of the Securities Act, Rule 10b-5(a) and (c), and Advisers Act Rule 206(4)-8(a)(2).  Artful pleading which recharacterizes misrepresentations as a scheme does not state a claim for scheme liability.  *SEC v. Benger*, 931 F.Supp. 2d 908, 913 (N.D. Ill. 2013).  Scheme liability requires proof that a defendant participated in an illegitimate, sham or inherently deceptive transaction.  *SEC v. St. Anselm Exploration Co.,* 936 F.Supp.2d at 1298-1299 (collecting cases).  The SEC must allege facts sufficient to show that Defendants' conduct had a deceptive purpose and effect.  *SEC v. Fraser*, 2009 WL 2450508 at *10-11 (D. Ariz. Aug. 11, 2009).  Conclusory allegations of an unspecified scheme to defraud do not state a claim for scheme liability.  *SEC v. Goble*, 682 F.3d at 944; *SEC v. Daifotis,* 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011).

      The SEC makes conclusory allegations that the Defendants employed a scheme to mislead investors about the "true financial health" and the "financial strength" of the Funds. AC ¶¶ 4-9; 14.  However, the SEC alleges no facts that either WSP or Mr. Altholtz engaged in an illegitimate, sham, or inherently deceptive transaction with respect to loans or guaranties.  Rather, the alleged misconduct relating to the loans and guaranties involves only misrepresentations.  AC ¶¶ 1-9; 41-72.  The allegations with respect to the newsletters similarly involve only misrepresentations.  AC ¶¶ 73-94.  Although the SEC characterizes

loans to the Funds as "artificial transfers of money" AC ¶ 9, it alleges no facts to support that characterization. There is no suggestion that funds were not really provided. That either Fund might borrow money was clearly disclosed to investors. Stealth Operating Agreement, Exhibit 5, Section 3.1(d). Further, in light of the illiquidity of securities of the Portfolio Companies, which was disclosed to investors, Stealth Placement Memorandum, Exhibit 2 p. 17 of 45, no reasonable investor could fail to understand that loans might be needed to meet ongoing cash needs.

The implausibility of the SEC's alleged scheme is underscored by the fact, as the SEC admits, AC ¶ 61, that no later than July, 2009, Defendants informed Stealth partners that Defendants would be putting their own funds at risk in loans to ICCW which Stealth would guaranty in part. If a scheme to defraud existed, as alleged by the SEC, this disclosure would not have been made. The voluntary disclosure of a key element of the purported scheme shows that the scheme allegations are implausible.

The SEC has failed to allege that each Defendant engaged in conduct with the purpose and effect of creating a misleading appearance of fact. Although the SEC states as a conclusion that loans to the Funds and two portfolio companies created a false appearance of the Funds' financial strength, no facts are alleged showing the appearance of financial strength that existed, and how the loans or guaranties made that appearance false or misleading.

The SEC has failed to state a claim for scheme liability.

## V.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR THE RELIEF REQUESTED.

### A.    The SEC is Not Entitled to Declaratory Relief.

The first type of relief sought is a declaration that WSP and Mr. Altholtz violated the law. There is no legal basis on which declaratory relief may be granted.

The Declaratory Judgment Act, 28 U.S.C. 2201, allows a court to declare the rights of a party when there is a dispute about those rights.  However, declaratory relief should not be granted when it will serve no useful purpose.  *Otwell v. Alabama Power Co.,* 747 F.3d 1275, 1281 (11th Cir. 2014); *Medmac Casualty Ins. Co. v. Pineiro & Byrd, PLLC*, 783 F.Supp.2d 1214, 1216-7 (S.D. Fla. 2011).  No useful purpose is served by issuing declaratory relief here.

The SEC has alleged no ongoing conduct whose propriety is disputed.  All the violations alleged occurred well in the past.  A declaratory judgment regarding the legality of past conduct will not resolve a dispute about any party's present or future rights.

The SEC has requested that the Court impose a variety of sanctions on the Defendants based on alleged violations of the law.  The dispute between the parties about past conduct will be resolved by the Court's determination whether to grant the SEC's request for relief.  If the SEC fails to demonstrate an entitlement to relief, the Court need not reach the issue of whether a violation occurred.  *See, SEC v. Coleman,* 1993 WL 13653773, at *2 (D.D.C. Apr. 21, 1993) (it was unnecessary to address whether a defendant violated the securities laws where the SEC failed to show an entitlement for relief).  A declaration that the Defendants violated the law in the past, in and of itself, resolves nothing.

**B.      Claims For Penalties Arising More Than Five Years Prior To The Filing Of The Amended Complaint Are Untimely.**

Claims for penalties arising from conduct occurring before September 25, 2009 (five years prior to the filing of the Amended Complaint) are untimely under 28 U.S.C. 2462.  That is clear from *Gabelli v. SEC*, ___ U.S. ___, 133 S. Ct. 1216, 1220-1221 (2013).

The AC, on its face, demonstrates that penalties resulting from the following alleged misconduct are outside the five-year period of limitations:  fraud relating to all investments in the Adamas Fund, AC ¶ 21; fraud relating to investments in the Stealth Fund made prior to September 25, 2009; the Stealth Fund's guaranty of loans made by Altholtz family trusts, AC ¶¶ 36, 37,[8] 38; fraud relating to the loan made to Adamas, AC ¶ 45; fraud relating to the loan made to Stealth, AC  ¶ 47; and fraud relating to alleged misrepresentations made in newsletters, except for the September, 2009 newsletter, AC ¶¶ 53, 54, 55, 63.

Civil monetary penalties and bars from serving as directors or officers of public companies are "penalties" within the meaning of 28 U.S.C. § 2460.  *SEC v. Microtune, Inc.*, 783 F.Supp.2d 867, 883 (N.D. Tex. 2011) affirmed sub nom *SEC v. Bartek*, 484 Fed Appx 949 (5th Cir. 2012).  Injunctive relief also may be a penalty.  *SEC v. Graham*, 2014 WL 1891418, at *9 (S.D. Fla. May 12, 2014); *SEC v. Jones,* 476 F.Supp.2d 374, 383-5 (S.D.N.Y. 2007).

The only facts alleged in support of an injunction in this case are the allegations of past violations of the law, the most recent of which is now almost five years old.  An injunction against an investment advisor routinely leads to a bar from the financial securities industry.  Here, as in *SEC v. Jones,* the imposition of an injunction would have the sting of

---

[8]      The Superceding Note referred to in ¶ 37 is dated September 1, 2009.  *See*, Exh. 9.

punishment, and should be subject to the five year period of limitation set out in 28 U.S.C. § 2462.  476 F.Supp. at 385.

> **C.    The Complaint Does Not State a Plausible Claim for Disgorgement Because There Are No Allegations of Ill-Gotten Gains From Violations of the Securities Laws.**

Disgorgement is a discretionary remedy designed to deprive a securities law violator from profits flowing from violations.  *SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir. 1978).  The AC does not allege that Defendants realized any profits.

The only economic benefit to WSP and Mr. Altholtz which the SEC alleges is their entitlement to management fees.  AC ¶ 28.  However, there are no allegations that WSP and Mr. Altholtz actually received management fees that were increased by any violation of the law.  The payment of interest on a loan was a profit, but that profit was not alleged to have been paid to either WSP or Mr. Altholtz.  The repayment of the principal of loans made to the Funds is not "profit."  Similarly, the payment of the capital account to the withdrawing Altholtz family trust limited partner involved a loss, not a profit, and, in any event, was not paid to either of the Defendants.  There are no facts anywhere in the AC which state a plausible claim for disgorgement.  Without such facts, the claim for disgorgement should be dismissed.

## VI.    CONCLUSION

The AC fails to allege facts stating a plausible claim for securities fraud, and fails to allege that Defendants realized any profits that are subject to disgorgement.  Further, civil monetary penalties, a director and officer bar, and an injunction, on the facts alleged, all constitute penalties and cannot be based on conduct which occurred prior to September 25, 2009.  The Motion to Dismiss the Amended Complaint should be granted.

Dated this 23rd day of February, 2015.

Respectfully submitted:


_____ s/ David A. Zisser _____
David A. Zisser
DAVIS GRAHAM & STUBBS LLP
Colorado Bar Number 11889
Attorney for Defendants
Wealth Strategy Partners, L.C. and
Harvey Altholtz
Davis Graham & Stubbs LLP
1550 17th Street, Suite 500
Denver, Colorado  80202
Telephone:  (303) 892-9400 – Main
Telephone:  (303) 892-7256 - Direct
Fax:  (303) 893-1379
Email: david.zisser@dgslaw.com

William Schifino, Jr.
BURR & FORMAN LLP
Florida Bar Number 564338
Daniel P. Dietrich
Florida Bar Number 934461
Attorney for Defendants
Wealth Strategy Partners, L.C. and
Harvey Altholtz
One Tampa City Center, Suite 3200
201 North Franklin Street
Tampa, FL 33602
Phone:  (813) 221-2626
Fax:  (813) 221-7335
Email:  WSchifino@burr.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of February, 2015, I caused to be electronically filed the foregoing MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO RULE 12(b), F.R.C.P. ON BEHALF OF DEFENDANTS WEALTH STRATEGY PARTNER, LC AND HARVEY ALTHOLTZ (Dispositive Motion) with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James M. Carlson, Esq.
carlsonja@sec.gov
Securities and Exchange Commission
Suite 1800
801 Brickell Avenue
Miami, Florida  33131


                                        s/ David A. Zisser
                              David A. Zisser
                              Davis Graham & Stubbs LLP
                              1550 17th Street, Suite 500
                              Denver, Colorado  80202
                              Telephone:  (303) 892-9400 – Main
                              Telephone:  (303) 892-7256 - Direct
                              Fax:  (303) 893-1379
                              Email: david.zisser@dgslaw.com